# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles R. Norgle | Sitting Judge if Other than Assigned Judge | Arlander Keys |
|---|---|---|---|
| **CASE NUMBER** | 99 C 5499 | **DATE** | 3/22/2002 |
| **CASE TITLE** | Coolsavings.com, Inc. vs. Brightstreet.com, Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Report and Recommendation regarding the enforcement of the parties' settlement agreement is submitted to Judge Norgle. It is recommended that the case be dismissed with prejudice. All matters relating to the referral of this action having been resolved, the case is returned to the assigned judge. *AK*

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | 2 number of notices | Document Number |
| | No notices required. | | |
| ✓ | Notices mailed by judge's staff. | MAR 2 5 2002 date docketed | 456 |
| | Notified counsel by telephone. | | |
| | Docketing to mail notices. | docketing deputy initials | |
| | Mail AO 450 form. | | |
| ✓ | Copy to judge/magistrate judge. | 3/22/2002 date mailed notice | |
| FT/*alay* | courtroom deputy's initials | 02 MAR 22 PM 2:19 | FT mailing deputy initials |
| | | Date/time received in central Clerk's Office | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| COOLSAVINGS.COM, INC. | ) |
| | ) No. 99 C 5499 |
| Plaintiff, | ) |
| | ) Judge Charles R. Norgle |
| v. | ) |
| | ) Magistrate Judge |
| | ) Arlander Keys |
| BRIGHTSTREET.COM, INC. | ) |
| | ) |
| Defendant. | ) |

TO: THE HONORABLE CHARLES R. NORGLE
UNITED STATES DISTRICT JUDGE


DOCKETED
MAR 2 5 2002

## REPORT AND RECOMMENDATION

The Court must determine which of several competing documents most accurately reflects the settlement agreement reached on October 29, 2001. For the reasons set forth below, this Court is of the opinion that the settlement agreement presented to this Court by Coolsavings.com, Inc. ("Coolsavings") on February 1, 2002, with minor revisions, documents the agreement reached by the parties. The Court therefore recommends that the case be dismissed with prejudice.

## PROCEDURAL HISTORY

Coolsavings sued Brighstreet.com, Inc. ("Brightstreet") on August 23, 1999, for patent infringement. The litigation was cantankerous from its onset; the parties had several discovery disputes, disagreed as to whether the issue of liability should be

bifurcated from the issue of willfulness, and battled over whether certain attorney advice should be disclosed. Before these issues were resolved, Judge Norgle referred the case to this Court for settlement.

The first settlement conference was held on November 29, 2000, and the outlook for settlement was promising. In its November 29th Minute Order, the Court noted that substantial progress had been made and that counsel would consult with their clients about the terms that had been discussed. In light of the parties' progress, this Court found good cause for extending various filing deadlines to permit the parties to focus on settlement. Unfortunately, the subsequent negotiations were not as fruitful as the initial settlement conference.

On December 20, 2000, the Court conducted a hearing, during which the parties advised the Court that they were very near to settlement. The parties agreed to contact the Court on January 2, 2001 to advise the Court of the status of their negotiations. The Court entered a Minute Order on January 2nd, finding that the parties were working diligently toward resolving their dispute and directing the parties to contact the Court again two days later. When the parties conceded that settlement was still elusive on January 4, 2001, the Court agreed to one final extension, and directed the parties to report on the status of their negotiations

by January 16, 2001.[1]

During a January 16, 2001 telephone conference, it was agreed that the parties would meet with the Court the following week in an effort to finalize a settlement agreement. The Court conferred with the parties on January 24th, February 2nd, and February 27th, before finally concluding that settlement was unlikely, as the parties had been unable to resolve at least one critical issue after three months of negotiations.

The parties enlisted the Court's assistance in a new round of settlement negotiations that began on July 18, 2001. On July 25, 2001, the parties canceled a settlement conference scheduled for the next day, claiming that they were, once again, on the verge of settling the case. On August 1, 2001, the parties advised the Court that, while they were very close to settling, they were still discussing the potential for continued business relations between the parties. Three weeks later, the parties still had not resolved their dispute, and asked the Court's indulgence as they sought to iron out their differences.

On September 4, 2001, Judge Norgle ruled on numerous pending motions and set the case for trial on February 12, 2002. Judge Norgle's ruling apparently inspired the parties to finally resolve the matter, and they scheduled a settlement conference with this

---

[1] This status was initially set for January 12, 2001 and reset to January 16, 2001.

Court for October 29, 2001. Wary of wasting its time and resources, the Court directed the parties to have present at the conference individuals with full authority to settle the matter once and for all. Both parties submitted proposed agreements in advance of the conference. Notably, both Coolsavings and Brightstreet proposed that the case be dismissed with prejudice if the case were to settle.

Finally, during the October 29, 2001 settlement conference, the parties reached an agreement as to all material issues in dispute. Following negotiations in this Court's chambers, the parties proceeded to the courtroom to put their agreement on the record. The parties created a thoughtful plan for dealing with an issue that had impeded their prior attempts at settlement; specifically, the possibility that Brightstreet would sell substantially all of its assets in the foreseeable future. The transcript documents the parties' decision to have the terms of the agreement contingent upon the outcome of Brightstreet's proposed sale of its assets. The parties agreed that, in the event that Brightstreet was able to sell substantially all of its assets on or before January 30, 2002, "Plan A" would dictate the terms controlling the parties' settlement. In the event that Brightstreet was unable to complete such a sale, the parties' dispute would be resolved under the terms of "Plan B." The parties went on to describe the essential elements of Plan A and Plan B.

The parties repeatedly acknowledged on the record that the case had been settled, and promised to deliver to the Court a written document reflecting this agreement. Over the next several months, the parties argued about the specifics of their agreement, without ever producing a mutually agreeable document. One factor complicating this process has been Brightstreet's purported sale(s) of its assets to another entity.

In December of 2001, Brightstreet entered into a transaction with e-centives, whereby Brightstreet sold most of its tangible and other non-patent assets. However, Coolsavings took issue with whether and to what extent this sale transferred Brightstreet's patent assets to e-centives. Brightstreet refused to disclose the asset sale agreement to Coolsavings, refusing to divulge even the identity of the purchaser. Brightstreet contended that the documents were highly sensitive and confidential. Coolsavings promptly attacked Brightstreet's representation regarding the highly confidential nature of these documents, and produced copies of Brightstreet's sales documents, which Coolsavings found on the internet.

Brightstreet sidestepped Coolsavings' attack on its credibility by countering that any dispute regarding the confidentiality and scope of the e-centives' contract was moot, because Brightstreet allegedly entered into a second transaction prior to January 31, 2002, which (Brightstreet claims) resolves any

5

doubt that Brightstreet is divesting itself of its patent assets. In this second transaction, Brightstreet purportedly transfers "all right, title and interest in and to the Patents, including its reversionary interest therein, if any, to [an unidentified] Buyer."

The Court currently has before it several settlement agreements, none of which the parties find mutually agreeable. In addition, both parties dispute whether Brightstreet has, in fact, sold substantially all of its assets, and whether resolution of that question is a matter for this Court to decide.

Finally, although both parties represented in open Court and in various letters to this Court that settlement had been achieved, Brightstreet is now apparently entertaining doubts about the existence of a settlement.

## DISCUSSION

There are two questions before the Court: 1) did the parties reach an enforceable settlement agreement on October 29, 2001?; and 2) if so, which party's draft settlement agreement most accurately reflects the terms of that agreement? The Court will address each issue in turn.

### A. The Parties Entered Into An Enforceable Settlement Agreement

Resolution of the first question is relatively straightforward. The oral agreement reached by the parties in the Court's chambers and later defined on the record constitutes a binding settlement agreement. The Seventh Circuit has held that a

6

settlement agreement reached in court and put on the record, with both parties stating their agreement, is binding and enforceable. *Wilson v. Wilson,* 46 F.3d 660, 664, 667 (7th Cir. 1995) ("a settlement agreement or stipulation voluntarily entered into cannot be repudiated by either party and will be summarily enforced by the Court.") The fact that the parties' oral agreement requires the parties to agree on specific terms and language in the future will not prevent the agreement from being enforced. *Mattingly v. City of Chicago,* 897 F. Supp. 375, 377 (N.D. Ill. 1995). Rather, the agreement will be enforced if "the terms to be agreed upon in the future can be determined independent of a party's mere 'wish, will, and desire' either by virtue of the agreement itself or by commercial practice or other usage or custom." *Id. (quoting United States v. Orr Const. Co.,* 560 F.2d 765, 769 (7th Cir. 1977)).

In this case, both parties conceded, on the record, that the case had been settled. They went on to describe all material terms and agreed to return to the Court a written document reflecting their agreement. The parties stated that the settlement would be structured as follows: if Brightstreet successfully sells substantially all of its assets by January 31, 2002, then Plan A will apply, otherwise, Plan B will apply.

Under Plan A, Brightstreet promises that it will no longer engage in the activity covered by the Coolsavings' patent, that is, offering coupon services via the internet. In addition,

7

Brightstreet agrees that it will not initiate or participate in any challenge to the validity of the Coolsavings' patent, unless legally compelled to do so.

In exchange for these promises, Coolsavings agrees to dismiss its claims against Brightstreet for past infringement. Coolsavings further promises that it will not in any way interfere with Brightstreet's attempts to sell its assets. Coolsavings then clarified, and Brightstreet agreed, that the phrase "the sale of substantially all of its assets" would "necessarily include the . . . patents and patent applications. That's the . . . part of this transaction that's - that is the significant substantial part." (Tr. at 7.)

Under Plan B, the parties will cross-license their patent portfolios that are in existence as of January 31, 2002. The parties explained that the patent portfolios include all patents that are owned by, issued to, and/or that have been applied for as of the settlement date. In the event that Brightstreet declares bankruptcy, Coolsavings' license in the Brightstreet patents will be protected.

The parties noted that the purpose of having the two alternate plans was to eliminate the need for having to come back to this Court in the event Brightstreet were unable to execute its proposed sale prior to January 31, 2002.

8

Both Coolsavings and Brightstreet concede that they had agreed to be bound by these terms, and that the contingency structure outlined above accurately reflects their intentions. Moreover, neither party asserts that the agreement fails for lack of a material term. However, Brightstreet advances a rather equivocal position, insisting that the determination of whether or not an enforceable settlement agreement exists depends upon the Court ruling that Brightstreet has, in fact, sold substantially all of its assets and that Plan A applies. More specifically, Brightstreet insists that, unless the Court finds that its recent transactions resulted in the sale of "substantially all of its assets," then this material phrase means something other than what Brightstreet intended it to mean, and there was no meeting of the minds. In support of its position, Brightstreet has proffered to the Court redacted documents that allegedly substantiate its claim.

Brightstreet's puerile position misses the mark in several important respects. First, the Court disagrees that it must evaluate Brightstreet's transactions before ascertaining whether the parties agreed to settle this case in October. The fact that the parties achieved settlement is evidenced by the transcript from the October 29, 2001 settlement conference. The Court stated on the record that the case had settled and neither party objected. Both parties expressly admitted that the case was settled during the settlement conference and in subsequent correspondence. And,

as discussed above, the settlement agreement contains all material terms.

Next, the phrase "sale of substantially all of its assets" is not ambiguous; it is defined on the record. Coolsavings explicitly stated on the record that the phrase "substantially all its assets" necessarily includes Brightstreet's patents, and that it was Brightstreet's patents – not, say, Brightstreet's furniture or real estate holdings – that represented the significant part of the proposed asset transaction. Brightstreet agreed with this characterization in open court. If Brightstreet did not intend to be bound by Coolsavings' definition of "substantially all its assets," it had ample opportunity at the settlement conference to explain that this definition did not reflect its understanding of the parties' agreement. Brightstreet's attempt to distance itself from this admission at this juncture simply comes too late. *Young v. FDIC*, 103 F.3d 1180, 1195 (4th Cir. 1997)("Having second thoughts about the results of a valid settlement agreement does not justify setting aside an otherwise valid agreement.")

Finally, the Court finds that its role is properly confined to determining whether the parties agreed to settle this case and the terms of that settlement agreement. A review of the transcript and the record reveals that, at the time the parties settled this case, the parties did not intend to have the Court decide whether Brightstreet sold substantially all of its assets. During the

10

settlement conference, the parties agreed to produce a settlement agreement to the Court within a few weeks; long before the anticipated sale on January 31, 2002. This fact, particularly when considered in light of the contingent structure of the settlement agreement, evidences the parties' intention that they – not the Court -- would determine whether Brightstreet had sold substantially all its assets and which Plan would apply, after the case had been settled and dismissed.

This conclusion is further bolstered by the fact that both parties requested that this case be dismissed with prejudice in their initial pre-conference settlement proposals, at the settlement conference, and again in subsequent correspondence with this Court.[2] The fact that the parties intended the case to be dismissed with prejudice is significant because "once a suit is dismissed with prejudice the judge loses all power to enforce the terms of the settlement that may lie behind the dismissal." *Jessup v. Luther,* 277 F.3d 926, 928-29 (7th Cir. 2002). It is only when a court expressly states that it is retaining jurisdiction in the order entering the settlement agreement that the court may enforce

---

[2]/Initially, Brightstreet insisted that the case be dismissed with prejudice upon entry of the settlement agreement. When Coolsavings later objected that the parties did not expressly state whether the case would be dismissed with or without prejudice, Brightstreet retorted that the purpose of entering into the lawsuit was to terminate the present litigation. Coolsavings then retracted its objection and agreed that the case should be dismissed with prejudice.

11

the terms of the agreement without necessitating the filing of a new lawsuit. *Id.*

In conclusion, settlement agreements are private contracts between private parties. *Union Oil Co. v. Leavell,* 220 F.3d 562, 568 (7th Cir. 2000). The settlement agreement in this case contemplated that, after the case had settled and been dismissed, the parties would have to decide whether Brightstreet had, in fact, sold substantially all of its assets. But for the fact that the parties have been unable to agree upon a single draft agreement, there is no question that Brightstreet would have had to demonstrate to Coolsavings that it sold substantially all of its assets under the parties' settlement agreement. The Court will not disregard the parties' intention at the time of settlement simply because Brightstreet does not want to disclose its transaction documents to Coolsavings.[3] Rather, any dispute regarding whether Brightstreet sold substantially all of its assets will either be decided between the parties or "enforced in the usual way, that is, by a fresh suit." *Jessup,* 227 F.3d at 929.

---

[3] Notably, it appears that Brightstreet wants this Court to decide whether it sold substantially all of its assets because it does not want to disclose the sale documents to Coolsavings. Brightstreet contends that these documents, like the e-centive sale documents, are highly sensitive and confidential. However, it is precisely because of Brightstreet's blatant misrepresentation concerning the confidential nature of the e-centives' documents that this Court simply cannot accept Brightstreet's similar characterization of the current sale documents.

## B. Coolsavings' February 1, 2002 Submission Most Accurately Reflects the Parties' Agreement.

Having determined that the October 29th settlement conference did, in fact, result in an enforceable agreement to settle the underlying litigation, the Court must now determine which party's proposed settlement agreement most accurately reflects the terms agreed upon. After careful review, the Court finds that Coolsavings' February 1, 2002 proposal most accurately reflects the parties' settlement agreement.

Coolsavings' February 1st proposal tracks the dual structure of the agreement, taking into account the different terms that will govern depending upon whether Brightstreet has sold substantially all its assets. The proposal defines the essential terms and fully describes the parties' cross-licensing agreement in the event "Plan B" applies. Although this proposal initially suggests that the case be dismissed without prejudice, Coolsavings dropped this suggestion after Brightstreet persuasively argued that the parties had agreed to have the case dismissed with prejudice.

The proposal documents the parties' reciprocal promises regarding Brightstreet's role in any challenge to Coolsavings' '648 patent, Coolsavings' release of Brightstreet from infringement liability, and Coolsavings' promise not to interfere with Brightstreet's attempts to sell its assets. In addition, the proposal provides for the agreed-upon protection for Coolsavings in the event that Brightstreet were to file for bankruptcy. All of

13

these promises are documented in the transcript of the settlement conference.

Therefore, the Court recommends the adoption of Coolsavings' February 1st proposal, excepting that the case be dismissed with prejudice.

**C. Confidentiality.**

Although not directly implicated, the Court believes it appropriate to comment on the issue of confidentiality. As a general rule, judicial proceedings are public matters. *Jessup*, 277, F.3d at 927 (discussing the public's interest in maintaining accessibility to judicial proceedings.) However, litigants are entitled to litigate disputes while maintaining the confidentiality of certain sensitive information, such as trade secrets. *Id.* at 928. But this exception to the general rule is limited to the litigant's ability to demonstrate that its interest in secrecy is compelling. *Id.*

In this case, Brightstreet argued that the Court should maintain the confidentiality of its asset sale agreement with e-centives, as the document contained highly sensitive and secretive information. Brightstreet's credibility suffered a blow when Coolsavings demonstrated that the e-centive sale agreement was not entitled to such protection because the information contained therein was already public; Brightstreet was able to locate the e-centive agreement on the Internet. In light of this information,

Brightstreet's representations appear to be nothing more than an attempt to prevent Coolsavings from challenging Brightstreet's bald assertion that it had transferred substantially all its assets.

In contrast to court filings, settlement agreements are, generally speaking, private contracts between private parties. Not surprisingly, both parties have stated their desire to keep their agreement confidential. However, because the parties were unable to produce a mutually agreeable settlement instrument without the Court's assistance, their agreement becomes part of the Court and, therefore, the public record. *Herrnreiter v. Chicago Housing Authority*, No. 01-3202, 2002 WL 215907, at *2 (7th Cir. Feb. 13, 2002). "[W]hen parties to a [settlement] ask a court to interpret and enforce their agreement, the contract enters the record of the case and thus becomes available to the public." *Id.* Therefore, although the parties have agreed that the settlement agreement should remain confidential, it is now part of the record.

## **CONCLUSION**

After almost one year of false starts and near misses, Coolsavings and Brightstreet finally resolved the underlying litigation by entering into an oral settlement agreement on October 29, 2001. Although the parties were unable to produce a mutually agreeable written document that accurately reflected this agreement, the Court finds that the transcript from the October 29th settlement conference evidences the fact that the parties reached

15

agreement on all material terms. Implicit in this conclusion is the Court's rejection of Brightstreet's contention that, unless this Court rules that Brightstreet sold substantially all of its assets, there was no meeting of the minds.

The Court is of the opinion that Coolsavings' February 1, 2002 submission most accurately reflects the agreement reached in open Court on October 29, 2001. However, the Court finds that, contrary to Coolsavings' February 1st submission, the case should be dismissed with prejudice.

DATED: March 22, 2002      RESPECTFULLY SUBMITTED:


_____
ARLANDER KEYS
United States Magistrate Judge


Counsel have ten days from the date of service to file objections to this Report and Recommendation with the Honorable Charles R. Norgle. See FED. R. CIV. P. 72(b); 28 U.S.C. § 636(b)(1). Failure to object constitutes a waiver of the right to appeal. *Egert v. Connecticut Gen. Life Ins. Co.*, 900 F.2d 1032, 1039 (7th Cir. 1990).